UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ALEX OLIN JOHNSON,<br><br>Defendant. | 4:20-CR-40109-KES<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Defendant Alex Olin Johnson is before the court on an indictment charging him with conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846.  See Docket No. 1.  Mr. Johnson has filed a motion to suppress certain evidence.  See Docket No. 20.  The United States ("government") resists the motion.  See Docket No. 26.  This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

**FACTS**

An evidentiary hearing was held on March 1, 2021.  Mr. Johnson was there in person along with his lawyer, Ashley Brost.  The government was represented by its Assistant United States Attorney, Tamara Nash.  Five

witnesses testified and nine exhibits were received into evidence.  From this testimony and these exhibits, the court makes the following findings of fact.

The South Dakota Division of Criminal Investigation ("DCI") was engaged in an ongoing investigation of a multi-state drug trafficking operation.  The investigation began when personnel at the South Dakota State Penitentiary learned that some inmates were using prison telephones to call co-conspirators outside the prison to coordinate the trafficking of methamphetamine.

On November 7, 2019, law enforcement engaged in monitoring calls from the penitentiary associated with the trafficking operation because they believed a load of methamphetamine had arrived in South Dakota on November 3, 2019.  DCI Special Agent Daniel Byron had reason to believe the remaining methamphetamine from this load was with Senthong Phiengsai, and Special Agent Byron was monitoring the phone calls in an effort to ascertain Mr. Phiengsai's location.  At approximately 12:05 p.m., DCI Special Agent Matthew Glenn received information from Special Agent Byron that Darrius Two Eagle, an inmate at the penitentiary connected to the drug trafficking operation, was on a phone call with a known person of interest, ███████ ███████ by way of a three-way call routed through Lisa Cuff.  By monitoring the call, investigators learned that ███████████ was at Mr. Phiengsai's apartment to collect money or the remaining methamphetamine on behalf of the trafficking operation.  Investigators had previously identified Mr. Phiengsai's apartment as one of the units at ███████████████████ ███████████  At the beginning of the monitored conversation between Mr.

2

Two Eagle and ████████ Special Agent Byron learned Mr. Phiengsai's apartment number was ████

     Special Agent Glenn had previously conducted surveillance of Mr. Phiengsai's apartment building on November 3, 2019, when they monitored two individuals traveling from Omaha to Sioux Falls with what investigators believed was six pounds of methamphetamine. The individuals arrived at ████ ████ went to the north side of the building, then left. After they left, those individuals were stopped by law enforcement with approximately 1.75 pounds of methamphetamine. At that time, investigators knew Mr. Phiengsai lived at ████████

     Special Agent Glenn testified that this surveillance was part of a larger investigation into narcotics distributions ordered by inmates at the South Dakota State Penitentiary that, as of November 2019, had led to the seizure of approximately ████ of methamphetamine. Special Agent Glenn also testified that, sometime in October 2019, there was surveillance of a woman going to ████████ to meet with someone and pick up a load of methamphetamine.

     Based on the ████ call, law enforcement began live surveillance of Mr. Phiengsai's apartment at approximately 12:13 p.m. <u>See</u> Def. Ex. C at p. 1. On the call, ████ spoke with an individual identified as Mr. Phiengsai's roommate and then with Mr. Phiengsai, who declined to give ████████ the drug proceeds. Special Agent Byron, who was monitoring the call, informed

Special Agent Glenn that ████████ had told Mr. Two Eagle on the call that Mr. Phiengsai and his roommate were paranoid.

At around 12:23 p.m., ████████ left Mr. Phiengsai's apartment building with an unknown woman.  See Def. Ex. C at p. 1.  Special Agent Glenn observed one of the women was talking on a cell phone.  Special Agent Byron confirmed to Special Agent Glenn that the call between Mr. Two Eagle and ████████ was still ongoing.  The two women drove away from the building in a silver Toyota Rav4 at around 12:35 p.m.  The surveillance units followed the Rav4.  The investigators requested assistance from South Dakota highway patrol troopers to effectuate a traffic stop of the Rav4.  At around 12:43 p.m., South Dakota Highway Patrol officers conducted a traffic stop of the Rav4, and ████████ and the other individual, identified as ████████ were found in possession of 6.6 grams of methamphetamine.

At around 12:54 p.m., surveillance resumed at Mr. Phiengsai's apartment building.  At approximately 2:12 p.m., Special Agent Glenn observed someone matching the description of Austin Johnson[1] leave ████████ and begin driving a blue Chevrolet pickup truck.  See Def. Ex. C at p. 1. Special Agent Glenn testified that Austin Johnson was driving "in a manner consistent with someone trying to look for surveillance units."  Docket No. 30 at pp. 20-21.  Austin Johnson drove past Special Agent Glenn's vehicle twice, at one point stopping next to the vehicle and attempting to look inside the vehicle.  Austin Johnson then went back to the apartment building.  Special

---

[1] Austin Johnson is the older brother of the defendant in this case.

Agent Glenn testified that investigators were particularly interested in Austin Johnson because one of the objectives of their surveillance was to identify Mr. Phiengsai's roommate.  See Docket No. 30 at p. 41.  Austin Johnson was known to the Sioux Falls Area Drug Task Force from previous investigations, and, after Austin Johnson drove his truck around, investigators believed he might be Mr. Phiengsai's roommate.

Approximately two hours later, at about 4:01 p.m., investigators observed a white Pontiac G6 leaving the apartment building's parking lot. Special Agent Glenn testified that he believed the Pontiac had previously been parked at the apartment building for the duration of their surveillance.  See Docket No. 30 at pp. 53-54.  The surveillance investigators ran the white Pontiac's license plates[2] and learned it was also registered to Austin Johnson. The Pontiac's windows were darkened, and the investigators could not identify who was driving.  Special Agent Glenn testified at the suppression hearing that the investigators had no reason to believe the Pontiac was part of the larger narcotics operation.  See Docket No. 30 at p. 39.

At some point that afternoon, Sioux Falls Police Department Officer Nicholas Stevens began monitoring the narcotics investigators' encrypted radio channel.  Officer Stevens had access to this channel because he sometimes assisted narcotics investigators.  Someone from the Sioux Falls Area Drug Task

---

[2] Special Agent Glenn testified that part of their surveillance of ███████ █████ involved running the license plates of vehicles coming and going from the apartment complex.

Force had contacted Officer Stevens and asked for his assistance in their surveillance and provided information about the location under surveillance—████████████████ and where the investigators wanted him in relation to that location.  Officer Stevens testified that he also received information about Austin Johnson driving around in a truck doing what appeared to be countersurveillance.  <u>See</u> Docket No. 30 at p. 68.  Officer Stevens parked his patrol vehicle in a parking lot approximately three blocks west of ████████ ████████  Special Agent Glenn testified that someone from the surveillance unit contacted Officer Stevens to let him know what was going on and to request help with the traffic stop.  <u>See</u> Docket No. 30 at pp. 36-37, 49-50.

Officer Stevens testified that he watched the Pontiac drive past him then pulled out of the parking lot and drove after it.  <u>See</u> Docket No. 30 at p. 57. Officer Stevens noted that the Pontiac's front windows appeared darker than what is allowed under South Dakota law.  Officer Stevens could not identify the driver because of the tinted windows.

At around 4:04 p.m., Officer Stevens initiated a traffic stop of the Pontiac on suspicion of illegally tinted windows at the intersection of E. 8th Street and Omaha Avenue in Sioux Falls.  <u>See</u> Def Ex. B at pp. 2-3.  The camera mounted in the front of Officer Stevens' patrol vehicle captured video footage of the traffic stop.  A microphone on Officer Stevens' person captured audio.  <u>See</u> Gov. Exs. 1 & 2.  The court will recreate a timeline of the relevant events from the recordings.

**Dashcam Video pt. 1, Gov. Ex. 1 at 0:00:35:**[3] As the Pontiac pulled over in front of him, Officer Stevens reported its license plate number over the radio.

**0:00:50-0:00:55:** Officer Stevens asked the driver, who was the only person in the vehicle, for his license, registration, and proof of insurance.

**00:01:05:** The driver told Officer Stevens his license had been suspended.

**0:01:12:** The driver handed Officer Stevens a South Dakota identification card.  The card identified the driver as Alex Johnson, the defendant in this case.  Special Agents Byron and Glenn testified at the suppression hearing that the narcotics investigators were not monitoring Mr. Johnson, he was not a target of the narcotics investigation, and he was not mentioned by name in any of the monitored phone calls prior to the traffic stop.  See Docket No. 30 at pp. 12, 38.

**0:01:14-0:01:16:** Officer Stevens informed Mr. Johnson that the reason for the traffic stop was the window tint.

**0:02:01:** Mr. Johnson told Officer Stevens the vehicle was his brother's.

**0:02:12-02:34:** Mr. Johnson gave Officer Stevens the vehicle's registration and proof of insurance.

---

[3] The court will cite to the dashboard and backseat camera recordings from Officer Stevens' patrol vehicle (Gov. Exs. 1-4) in h:mm:ss format according to the time stamp displayed by the video player.  Unless otherwise noted, the citations that follow are to the government's hearing Exhibit 1.

**0:02:42:** Officer Stevens directed Mr. Johnson to get out of the vehicle and go to his patrol vehicle.

**0:02:52:** As they walked to the patrol vehicle, Officer Stevens radioed dispatch to request assistance from a traffic unit with a working window tint meter.

**0:03:03-0:03:14:** Mr. Johnson mentioned his dog was still in the Pontiac and joked that she was worried about him.

**0:03:30-0:04:10:** Officer Stevens radioed dispatch to run a license and warrant check for Mr. Johnson.

**0:04:06:** While Officer Stevens was talking into the radio, Mr. Johnson stated he was on his way to do laundry when he was stopped.

**0:04:55-0:05:02:** Officer Stevens talked to a traffic unit over the radio and explained that he needed assistance because his window tint meter had died.  Officer Stevens testified at the suppression hearing that requesting a traffic unit to measure the window tint was a routine part of a traffic stop for tinted windows.  See Docket No. 30 at pp. 59-60.

**0:05:33-0:06:02:** Dispatch returned Officer Stevens' request for Mr. Johnson's license status.  Officer Stevens informed Mr. Johnson his license was eligible to be reinstated.  Officer Stevens informed Mr. Johnson that he would give him a citation for driving without a license.

**0:07:25-0:07:40:** Officer Stevens explained to Mr. Johnson that a traffic unit was on its way with a working window tint meter.

**0:09:30-0:11:38:** Officer Stevens and Mr. Johnson had small talk.

**0:11:39-0:12:40:** Officer Stevens explained to Mr. Johnson that they were waiting because, although he was only giving Mr. Johnson a warning for the tinted windows, he needed to list an accurate reading of the window tint in the comments section of his report.

**0:12:45:** Officer Stevens told Mr. Johnson, "The other part of it is, too, I'm doing what's called roadside interdiction, okay?  . . . [W]hen there's nothing going on, like right now, I do the traffic stops and all that.  And then my job is to make sure there isn't guns, knives, drugs, bombs, hand grenades, stolen property, nothing like that going down the roadway.  Okay?  Is there anything in the vehicle like that?"  Mr. Johnson responded that there was not.  Officer Stevens asked, "Would you have any issue if I wanted to take a look?" Mr. Johnson told Officer Stevens that he could search the passenger compartment, because he knew what was in there, but not the trunk because he did not know what was in the trunk.

**0:13:49:** Officer Stevens exited his vehicle to greet the traffic unit officer, Sioux Falls Police Department Officer Jeff Gillespie.

**0:14:08-0:14:40:** Officer Stevens told Officer Gillespie that Mr. Johnson's dog was in the front seat of the Pontiac, and they asked Mr. Johnson if his dog would be fine with Officer Gillespie going up to the car to take a reading of the front window.  Mr. Johnson told them she would behave.  Officer Gillespie went up to the front driver's side window, which was partially rolled down, and playfully greeted Mr. Johnson's dog.

9

**0:14:42:** Officer Gillespie took a reading of 24% from the front driver's side window and relayed that information to Officer Stevens, who was standing near the Pontiac's driver side taillight.

**0:14:47-0:14:50:** While walking backwards toward the driver's door of his patrol car, Officer Stevens spoke quietly into his radio, "If there's a K-9 unit available, we'll take him." Officer Stevens testified at the suppression hearing that he understood part of the basis for the traffic stop was the ongoing narcotics investigation. To that end, Officer Stevens testified that he thought a K-9 unit was already on its way to the scene, but, after he observed on his mobile computer that no other unit was on its way, he requested the K-9 unit. See Docket No. 30 at pp. 61-62.

**0:15:31-0:16:00:** Officer Stevens took down the window tint meter's serial number because "[he] might as well just because." Officer Stevens and Officer Gillespie talked about how it probably was not necessary to take down the tint meter's serial number because the dashboard camera in Officer Stevens' patrol vehicle recorded Officer Gillespie measuring the window tint.

**0:16:43-0:17:23:** Officer Stevens told Officer Gillespie about a traffic stop he made "the other day" where he gave a motorist a ticket for an illegally tinted windshield without calling in a traffic unit to get a reading of the tint level because the windshield was obviously below the legal limit. Officer Gillespie noted that he would have to retrieve a special tint meter from the police station to read a tinted windshield, and Officer Stevens remarked that he would not make anyone do that because it would be "ridiculous."

**0:17:27-0:17:32:** Officer Gillespie asked Officer Stevens if the tint reading was all he needed, and Officer Stevens responded affirmatively and thanked Officer Gillespie.  Officer Gillespie left.  Officer Stevens got back in his patrol vehicle, where Mr. Johnson had been sitting in the front passenger seat.

**0:17:46:** Mr. Johnson joked about the temperature, "You'd think I'd have been fine with just a coat on."

**0:17:46-0:18:15:** Officer Stevens printed Mr. Johnson's citation for driving without a license.[4]  Officer Stevens testified that it would normally take him five or six minutes to issue a citation or warning.  See Docket No. 30 at pp. 99-100.

**0:18:17-0:18:57:** Mr. Johnson asked if he should expect to leave the Pontiac there.  Officer Stevens explained that Mr. Johnson should call someone to drive it away because Mr. Johnson could not drive it away without a valid driver's license, and that Officer Stevens would let Mr. Johnson go with the expectation that he would take care of reinstating his license.

**0:18:39:** While talking to Mr. Johnson, Officer Stevens placed the printed driver's license citation on the dashboard without reviewing it with Mr. Johnson.

**0:19:36-0:20:10:** Mr. Johnson engaged Officer Stevens in small talk, and the two chit-chatted.  Officer Stevens testified that during the time between his request for the K-9 unit and its arrival, he observed Mr. Johnson

---

[4] Officer Stevens confirmed at the hearing that the forward-facing camera in his patrol vehicle captured this and other printing in the windshield reflection.  See Docket No. 30 at p. 80.

to be "extremely nervous," even after learning that he would just receive a warning for the window tint and a citation for driving without a license.  See Docket No. 30 at pp. 62-63.  Officer Stevens testified that, during this time, he was waiting for the K-9 officer to arrive.  Id. at p. 83.

**0:21:15-0:21:23:** A Sioux Falls Police Department patrol vehicle drove up and parked facing the Pontiac.

**0:21:24:** Sioux Falls Police Department Officer Chad Westrum exited the driver's door of the newly arrived patrol vehicle.

**0:21:24-0:21:40:** As Officer Westrum walked along the front of the Pontiac and along its driver's side toward Officer Stevens' vehicle, Mr. Johnson asked Officer Stevens about the results from the window tint meter reading.

**0:21:44-0:23:00:** Officer Stevens exited his patrol vehicle to meet Officer Westrum, and the two had the following conversation:

> **Officer Stevens:** So, this is a stop for narcs. [5] Um, the long and the short—stopped him for his window tint.  [Officer Gillespie] just came out, read it.  It's illegal.  Um, was talking with him, said, "Hey, is there anything illegal in the car?"  He goes, "Well, it's my brother's car."  "'Kay?  Is there anything illegal in the car?"  "Well, you can search the main cabin area, but I don't know about anything anywhere else in the vehicle and I don't want you searching the trunk."
>
> **Officer Westrum:** Okay.
>
> **Officer Stevens:** So, um, pitbull is up front there.
>
> **Officer Westrum:** I seen that.

---

[5] Officer Westrum testified that he understood this to mean this was a stop for the narcotics investigators with the Sioux Falls Area Drug Task Force.  See Docket No. 30 at p. 109.

12

**Officer Stevens:** But she's been pretty friendly.  [Officer Gillespie] went up there and did his tint meter.  Everything was fine, so.  It's up to you whether you want to deploy or do a hand search.  [I'm] perfectly fine with either.

**Officer Westrum:** Well, I'm obviously not going to do a hand search with a dog in there.

**Officer Stevens:** Sure.  No, obviously we would pull her out, so . . . .

**Officer Westrum:** So you got consent for the cab and not the trunk?

**Officer Stevens:** Correct, so . . . .

**Officer Westrum:** I can deploy [Police Service Dog Robi] around the trunk and if he indicates then we can go from there.

**Officer Stevens:** Sure.

**Officer Westrum:** Unless you want to do a search up front.  It's up to you.

**Officer Stevens:** No, I'd just say, if you can, just have him walk the car and do his thing, and you know, obviously handle it from there.

**0:23:05-0:23:43:** Officer Stevens got back into the driver's seat of his patrol vehicle, and Officer Westrum spoke to Mr. Johnson through the open driver's door, asking him how his dog would respond to Robi walking around the car.  They agreed that Officer Westrum would roll up the Pontiac's windows before deploying Robi.  Officer Westrum testified that he observed some nervous behavior from Mr. Johnson, including shaking hands and sweating. See Docket No. 30 at p. 104.

**0:23:55-0:24:01:** Officer Westrum opened the Pontiac's driver's door and rolled up the windows.

13

**0:24:08:** As Officer Westrum went back to his patrol vehicle, Officer Stevens told Mr. Johnson that he would print a warning for the illegal window tint to give to his brother.

**0:24:20:** Officer Westrum opened the rear passenger door of his patrol car and Robi hopped out.

**0:24:25:** Officer Stevens began printing the window tint warning. Officer Westrum and Robi began their sniff of the Pontiac.

**0:24:40:** Officer Westrum and Robi began their second pass around the Pontiac.

**0:24:57:** As Officer Westrum and Robi passed the front passenger door of the Pontiac, Mr. Johnson remarked that his dog was getting excited.

**0:25:02:** Officer Westrum and Robi began their third pass of the vehicle.

**0:25:14:** Robi sat down near the rear passenger side wheel of the Pontiac.

**0:25:18-0:25:42:** Officer Westrum walked Robi back to his patrol vehicle and put Robi inside. Meanwhile, Officer Stevens printed another copy of the tinted window warning and took the citation for driving without a license off the dashboard.

**0:25:43-0:26:17:** Officer Stevens handed Mr. Johnson copies of the citation for driving without a license and the warning for illegally tinted windows. Officer Stevens reviewed them both with Mr. Johnson. Officer Westrum walked to the front passenger side door of Officer Stevens' patrol vehicle.

14

**0:26:34-0:27:12:** Officer Westrum noted that Mr. Johnson had already given consent to search the passenger compartment of the Pontiac and explained that Robi's sitting near the trunk meant he had detected the odor of illegal drugs there.  Officer Westrum advised Mr. Johnson that Robi's indication gave the officers probable cause to search the whole vehicle and that the officers would perform such a search.

**0:27:13-0:27:48:** Officer Westrum explained to Mr. Johnson that he should collect his dog from the Pontiac before the officers search the car.  Mr. Johnson asked if he should call someone to come pick up the dog, and Officer Stevens began telling Mr. Johnson that he could call someone, then Officer Westrum interrupted, stating that Mr. Johnson had no reason to ask someone to come pick up the dog unless he knew there was something in the car he would be arrested for.  Mr. Johnson stated that he knew his brother had "oil and stuff like that" in the car.  Officer Westrum reminded Mr. Johnson that, just because the officers would be searching the car did not mean he would go to jail, and Mr. Johnson stated he never thought that to be true.

**0:27:49-0:28:02:** Officer Stevens told Mr. Johnson that he could put his dog in the backseat of his patrol vehicle.  Officer Westrum stated that Mr. Johnson's dog would be warm in the vehicle, and Mr. Johnson noted that he was "definitely" staying warm in the car.

**0:28:10-0:28:27:** Mr. Johnson completed the citation for driving without a license by signing it.

**0:28:29-0:28:45:** Officer Stevens gave Mr. Johnson copies of the citation and warning, along with his identification card, proof of insurance, and registration.

**0:28:53-0:29:37:** Mr. Johnson exited Officer Stevens' patrol vehicle and walked to the Pontiac's driver's door, which he opened.  Officer Westrum and Officer Stevens, who also exited the patrol vehicle, stood behind Mr. Johnson. Mr. Johnson took his dog's leash and coaxed her from the vehicle. Mr. Johnson and his dog walked to the parkway next to the parked vehicles and stood out of frame.  Officer Stevens noted that he was happy to let Mr. Johnson stand outside with his dog while Officer Westrum conducted the search.

**0:28:39:** Officer Westrum began searching the passenger compartment of the Pontiac.

**0:31:31:** Officer Stevens and Mr. Johnson put Mr. Johnson's dog into the back seat of Officer Stevens' vehicle.  The footage from the back seat of Officer Stevens' patrol car shows Mr. Johnson's dog hopping onto the backseat while the two men remained standing outside with the car door open and Mr. Johnson holding the leash.  Backseat Video pt. 1, Gov. Ex. 3 at 0:31:40.

**0:34:45:** Officer Westrum began searching the trunk.  He placed some items on the hood of Officer Stevens' patrol vehicle.

**0:35:45:** Mr. Johnson told Officer Stevens he would like to call his mother, and Officer Stevens told Mr. Johnson he could close the rear door of

the patrol vehicle and get into the front seat.  Mr. Johnson closing the rear door was captured by the backseat camera.  Gov. Ex. 3 at 0:35:27.

**0:35:59-0:36:03:** With Mr. Johnson in the patrol vehicle, Officer Stevens asked Officer Westrum, who was still searching the Pontiac's trunk, if the contraband he had found was limited to marijuana.  Officer Westrum shook his head.

**0:36:12-0:36:19:** Mr. Johnson confirmed with Officer Stevens that he should call someone.  Mr. Johnson called his mother and asked her to come pick up his dog.  Mr. Johnson's mother did not appear to hear him.

**0:38:45-0:39:46:** Mr. Johnson then called his brother to ask him to pick up his dog.  Mr. Johnson told his brother that he was going to jail and that he had been pulled over for the tinted windows and police were searching the vehicle.  After Mr. Johnson hung up, Officer Stevens asked Mr. Johnson to confirm his address and phone number.  Mr. Johnson gave his address as 2400 E. 16th St. in Sioux Falls.

**0:41:45-0:42:22:** Officer Westrum stopped searching the trunk and made a phone call.  The call was not recorded by the microphone on Officer Stevens' person.  Officer Westrum testified that he contacted members of the Sioux Falls Area Drug Task Force because he came across an item he thought might be a one-pot methamphetamine cooking apparatus, and he needed their help to determine what the item actually was.  See Docket No. 30 at p. 108.  Officer Westrum noted that the detectives who responded to the scene determined the item was safe.  Id.

17

**0:42:33:** Mr. Johnson asked Officer Stevens if he should have someone come pick the car up.  Officer Stevens told Mr. Johnson he did not know and indicated he would find out.

**0:43:03:** Mr. Johnson, after receiving a phone call, told Officer Stevens his grandfather was on his way to pick up his dog.

**0:43:17:** Officer Stevens exited his patrol vehicle to speak with Officer Westrum about his ongoing search of the trunk.

**0:43:24:** Officer Stevens and Officer Westrum conversed about the fruits of the search and whether Mr. Johnson should have someone pick up the Pontiac.  Officer Stevens asked if they would need to seize the car, and Officer Westrum told him he had asked Minnehaha County Sheriff's Department Detectives Daniel Christensen and Pete Blankenfeld to respond to the scene to assist in identifying the suspected one-pot from the trunk.  Officer Westrum mentioned he had found butane in the trunk and stated he did not feel comfortable with the suspected one-pot sitting there.

**0:44:02:** Officer Stevens opened the front passenger door of his patrol vehicle and asked Mr. Johnson to come outside.  Officer Stevens directed Mr. Johnson to put his cell phone on the front passenger seat.

**0:44:08-0:44:50:** Officer Stevens asked Mr. Johnson to place his hands behind his back and placed him in handcuffs.

**0:44:51-0:44:57:** Officer Stevens asked Mr. Johnson if there were any dangerous or illegal items, including guns, knives, drugs, and needles, on his person.  Mr. Johnson responded, "No."

18

**0:45:00-0:45:33:** While off screen, Officer Stevens pat Mr. Johnson down and found a knife.  Mr. Johnson seemed surprised and apologized, stating he had forgotten he had it.

**0:45:41-0:46:27:** Still off screen, Officer Stevens began counting the cash he found when patting Mr. Johnson down.  Officer Stevens counted 700 United States dollars, all in $20 bills.

**0:46:28:** Mr. Johnson told Officer Stevens his grandfather was arriving.

**0:46:33-0:46:55:** Officer Stevens continued searching Mr. Johnson's person, but stopped when Mr. Johnson's grandfather approached.

**0:47:54-0:48:12:** Officer Stevens told Mr. Johnson he would wait to continue searching his person until after his grandfather left.  Officer Stevens apologized to Mr. Johnson that his grandfather saw him in handcuffs and stated that he should have waited to handcuff Mr. Johnson until after his grandfather had left with the dog.

**0:48:15:** Mr. Johnson's grandfather left with the dog.

**0:48:35-0:48:58:** Officer Stevens placed Mr. Johnson in the back of his patrol vehicle and shut the door.  The backseat camera captured Officer Stevens placing Mr. Johnson in the backseat.  Gov. Ex. 3 at 0:48:04.  From this point on, Mr. Johnson is visible in the recording captured by the backseat camera.

**0:51:56:** Sioux Falls Police Department Officer Dustin Jorgensen arrived and began helping Officer Westrum search the trunk.

19

**0:52:14-0:52:25:** With exam gloves on, Officer Jorgensen picked up the suspected one-pot methamphetamine cooking apparatus.  From the video recording, the item appears to be a plastic bottle with tubes attached.

**0:52:30:** Another officer arrived and began watching Officers Westrum and Jorgensen search the vehicle.

**0:54:06:** Mr. Johnson's brother, Austin Johnson, arrived and stood across the street watching the search.  One of the officers asked Mr. Johnson if that was his brother; Mr. Johnson responded affirmatively.  Gov. Ex. 3 at 0:54:13.

**0:55:28-0:55:36:** Officer Stevens and Officer Westrum had a conversation about whether they would need to seize the Pontiac.  Officer Westrum asked Officer Stevens who the man standing across the street was.  Officer Stevens stated he was Mr. Johnson's brother and a "target."  Officer Westrum asked if Mr. Johnson's brother had any warrants, and Officer Stevens replied that he did not.

**0:56:03:** Officer Westrum stated again to the other officers that he was nervous about the suspected one-pot, especially because he had also found butane in the trunk.

**0:56:54-0:58:56:** Officer Stevens took the keys, except the ignition key, from the Pontiac and delivered them to Austin Johnson.

**0:58:02:** While Officer Stevens was talking with Austin Johnson, Detective Christensen and Detective Blankenfeld arrived and began looking at the items seized from the trunk.

**0:59:25:** While Officer Stevens was recounting his contact with Austin Johnson to the other officers and detectives, Detective Christensen asked him, "Is it Austin?"  Officer Stevens responded affirmatively, and Detective Christensen mentioned that he had checked whether Austin Johnson had any warrants when he pulled up.

**0:59:42-0:59:56:** Detective Christensen picked up the suspected one-pot and stated, "I'd say this is just a really weird looking smoking utensil."

**0:00:17:**[6] Officer Westrum stated there was a Joe Foss ID card in Mr. Johnson's name inside one of the bags from the trunk of the Pontiac.

**0:00:29:** Officer Stevens noted to Detective Christensen that Austin Johnson had left the scene.

**0:01:34:** Detective Christensen went to the back of Officer Stevens' patrol vehicle to speak with Mr. Johnson.

Detective Christensen's conversation with Mr. Johnson was captured by the backseat camera in Officer Stevens' patrol vehicle.  See Backseat Video pt. 2, Gov. Ex. 4 at 0:01:38 and on.  Mr. Johnson remained sitting with hands cuffed behind his back while Detective Christensen stood outside with the door slightly open.  Their conversation proceeded as follows:

> **Detective Christensen:** Hey, Alex?
>
> **Mr. Johnson:** Yeah.
>
> **Detective Christensen:** How are ya?

---

[6] This citation and those that follow, unless otherwise noted, are to government's exhibit 2, the second part of the recording from Officer Stevens' patrol vehicle's front-facing camera.

**Mr. Johnson:** Good.

**Detective Christensen:** Um, I'm a detective from narcotics.  So, you've got some trouble there.

**Mr. Johnson:** No, I understand.

**Detective Christensen:** Uh, do you want to come and talk to us so you can help yourself?  I mean, you've got enough in there—  What do you have for criminal history?

**Mr. Johnson:** I don't have a criminal background.

**Detective Christensen:** Don't have any?

**Mr. Johnson:** I have a DWI, back—a couple years ago.

**Detective Christensen:** How old are you?

**Mr. Johnson:** 25.

**Detective Christensen:** How old's your brother?

**Mr. Johnson:** He's 31.

**Detective Christensen:** He's well known to us.

**Mr. Johnson:** I understand that.

**Detective Christensen:** You're not.

**Mr. Johnson:** I understand.

**Detective Christensen:** It's best to not be well known to us.

**Mr. Johnson:** I understand.

**Detective Christensen:** Okay.  But you have enough that you're— you know—you're kind of, you're at a point right now, and you go one way and become very well known to us, but this isn't gonna go away.

**Mr. Johnson:** Right.

**Detective Christensen:** You can come down and help—try to help yourself.  Tell me what you know about stuff.  Your brother is

gone.  He doesn't see me talking to you or anything.  I showed up because they wanted me to look at that thing.  What is that, like a . . . ?

**Mr. Johnson:** It's a bong.

**Detective Christensen:** Bong or something?  Yeah, that's what I told them I thought it was.  Caulk on it—I've never seen that before.  They were concerned with all the tubing that you might be trying to cook something.

**Mr. Johnson:** Okay, yeah.

**Detective Christensen:** I know you're not.  So, you want to go down?

**Mr. Johnson:** Um, I mean—

**Detective Christensen:** I mean, here's the things [sic] I want to know: Where are you getting it?  Okay.  I mean, you've got three ounces there, give or take, or pretty large shards that probably came off of somebody's pound or better.  Um, if it's your brother, it's your brother.

**Mr. Johnson:** No, it's not my brother.

**Detective Christensen:** Okay, not your brother?  Okay.

**Mr. Johnson:** No, my brother's not involved.

**Detective Christensen:** Okay.  I mean, you've got a pretty—a pretty hard distribution case there.

**Mr. Johnson:** Yeah.

**Detective Christensen:** So if you want some help, I'm offering it to you right now.  After this it won't happen.

**Mr. Johnson:** Okay.

**Detective Christensen:** What I want to do is sit down and talk to you.  I'd like to go through your phone with you.  Um, you know, with that, obviously we are going to talk about some things that are gonna be kind of, uh, incriminating towards you.  But you're sitting here caught.  The only person in a vehicle with three ounces of dope.  Maybe there's more but that's just what I saw.  And, uh,

23

so, you know, you're kind of in a hole right now, and I think you can only go up from there.  But it's up to you.  Okay?  I would like to go through your phone with you and, uh, I'd like to talk to you about who you are getting stuff with, and then maybe we can talk about some options where, uh, you know, depending on what those options are, depending on what you can do, maybe you avoid prison.  I don't know.  You know?  These are things out of my hands but I can have a strong suggestion in them, if you know what I mean.

**Mr. Johnson:** Yeah, I'd kind of like to have a lawyer present.

**Detective Christensen:** That won't happen.  Okay?  Um, that's fine.  That's your right, but I'm just telling you we don't sit down with you and an attorney.  So, if you want a lawyer, that's your prerogative, um, so I will ask you this last question: Can I look through your cell phone?

**Mr. Johnson:** Uh, I'd have to talk—consult with a lawyer first.

**Detective Christensen:** Okay, we are going to take it, write a warrant, and attempt to get into it that way then.

**Mr. Johnson:** Okay, I understand.

**Detective Christensen:** So, let me know if you have a change of heart.  If you do talk to an attorney, tell them you're kind of up shit creek right now.

**Mr. Johnson:** I understand.

\*       \*       \*

**Detective Christensen:** What I was saying is—"you don't get an attorney"—we don't call an attorney down to the station and sit there, all three of us, and have a conversation.  We just don't do that.

**Mr. Johnson:** I understand.

Id. at 0:01:41-0:05:30.

Officer Stevens drove Mr. Johnson to the Sioux Falls Police Department

Law Enforcement Center, and Mr. Johnson was later charged with possession

of a controlled substance with intent to distribute, possession of a controlled substance, possession of marijuana, and possession of paraphernalia.  Def. Ex. B at p. 3.  He was then transported to the Minnehaha County Jail.  Id.

In the Pontiac's cabin, Officer Westrum found a home security system stowed in a bag among Mr. Johnson's laundry.  In the Pontiac's trunk, Officer Westrum found Ziploc jeweler bags, methamphetamine pipes, cannabis pipes, scales, a Xanax pill, a cannabis pipe that appeared to have marijuana "wax" in it, an iPad, two cell phones, and three small bags containing a white crystal substance that field tested positive for methamphetamine.  Id.  The amount of methamphetamine found in the trunk was approximately 85 grams.

After the traffic stop, investigators contacted management for ███████ ███████ and learned that Mr. Johnson lived in unit ████ the same unit investigators believed Mr. Phiengsai lived in based on the █████call, and that his brother Austin Johnson stayed with him occasionally.

Special Agent Glenn applied for a search warrant for ███████████ ███████████ to the South Dakota State Circuit Court for the Second Judicial Circuit.  Gov. Ex. 5.  Special Agent Glenn used the traffic stop and the material collected from the Pontiac's trunk to support his application for the search warrant.  The state-court judge issued the warrant.  Gov. Ex. 6.  During the search of the apartment, police found a debit card and tray that field tested positive for methamphetamine, two baggies (one of which tested positive for methamphetamine), documents belonging to Mr. Johnson, a shotgun, owe sheets, and a surveillance camera and monitor.  The debit card and tray were

25

found in a bedroom that also contained some documents belonging to

Mr. Phiengsai.

On October 20, 2020, the government filed a grand jury indictment

charging Mr. Johnson with conspiracy to distribute a controlled substance in

violation of 21 U.S.C. §§ 841(a)(1) and 846.  See Docket No. 1.  On February

16, 2021, Mr. Johnson filed a motion to suppress the evidence seized during

the search of the Pontiac's trunk, the statements he made to Detective

Christiansen, and the evidence seized during the search of his apartment.  See

Docket No. 21.

## DISCUSSION

**A.     Whether Evidence Obtained from the Pontiac Should Be Suppressed**

Mr. Johnson first asserts that the evidence obtained during the search of

the Pontiac should be suppressed because the officers violated the Fourth

Amendment by unreasonably prolonging the traffic stop and conducting an

unlawful search of the vehicle.

The Fourth Amendment to the United States Constitution guarantees

"[t]he right of the people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

A traffic stop constitutes a seizure within the meaning of the Fourth

Amendment.  United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004).

Therefore, a traffic stop must be supported by reasonable suspicion or probable

cause.  United States v. Chartier, 772 F.3d 539, 543 (8th Cir. 2014).

### 1.    Applicability of <u>Terry</u> and <u>Rodriguez</u>

It is settled law that the principles of <u>Terry v. Ohio</u>, 392 U.S. 1 (1968) govern traffic stops.  <u>United States v. Jones</u>, 269 F.3d 919, 924 (8th Cir. 2001). As a preliminary matter, the government argues the traffic stop in this case should not be analyzed according to <u>Terry</u> because Officer Stevens had probable cause, not just reasonable suspicion, to stop Mr. Johnson.

The government argues Officer Stevens' probable cause was two-fold: (1) based upon his observation of the too-dark window tint and (2) based upon his knowledge of the ongoing narcotics investigation.  First, the court agrees that Officer Stevens' observation of the tinted windows provided sufficient probable cause, independent of his knowledge of the narcotics investigation, to initiate a traffic stop of Mr. Johnson.  <u>See</u> <u>United States v. Pena-Ponce</u>, 588 F.3d 579, 583 (8th Cir. 2009) (affirming district court's finding that officer's observation of tinted windows provided probable cause to initiate a traffic stop). This is because "[a]n officer's observation of a traffic violation, however minor, gives the officer probable cause to stop a vehicle, even if the officer would have ignored the violation but for a suspicion that greater crimes are afoot."  <u>Id.</u> (quotation omitted).

Second, the government asserts Officer Stevens had probable cause to stop Mr. Johnson based upon the investigators' knowledge from the ongoing narcotics investigation.  "[P]robable cause for the stop and search of [a] vehicle may be based on the collective knowledge of all law enforcement officers involved in the investigation and need not be based solely upon information

within [the] knowledge of the officer(s) on the scene if there is some degree of communication." United States v. Rowe, 878 F.3d 623, 628 (8th Cir. 2017). "When multiple officers are involved in an investigation, probable cause may be based on their collective knowledge and need not be based solely on the information within the knowledge of the arresting officer as long as there is some degree of communication." United States v. Robinson, 664 F.3d 701, 703 (8th Cir. 2011) (quotation omitted).

Officer Stevens testified at the hearing that he was listening to the narcotics investigators' radio channel and was contacted by one of the investigators about the Pontiac. Officer Stevens also testified that he was aware of Austin Johnson's countersurveillance efforts. Therefore, the government has shown there was "some degree of communication" (Rowe, 878 F.3d at 628), and the court will evaluate whether the information known to police collectively provided sufficient probable cause to stop Mr. Johnson.

The government argues that the stop of the Pontiac was not a routine traffic stop because investigators had probable cause to believe it was involved in the trafficking operation. See Docket No. 26 at p. 9. In support of this proposition, the government cites United States v. Rowe, No. CR 15-164 (DSD/BRT), 2016 WL 11394998, at *6 (D. Minn. Feb. 11, 2016), report and recommendation adopted, 2016 WL 916377 (D. Minn. Mar. 10, 2016), aff'd, 878 F.3d 623 (8th Cir. 2017), cert. denied, 138 S. Ct. 1602 (2018). In Rowe, a reliable confidential informant told police a large quantity of cocaine would be driven from Arizona to Minnesota in a gray BMW on a certain day. Rowe, 2016

28

WL 11394998, at *1.  The informant also told police the name of the owner of

the BMW.  Id.  Police found through a records check that the person named by

the informant owned a BMW with Minnesota license plates, and police recorded

the license plate number.  Id.  Investigators corroborated the informant's

information with another source.  Id.  Investigators alerted law enforcement to

the BMW's anticipated travel, and law enforcement monitored the interstates in

Minneapolis in an effort to locate the vehicle.  Id.

      Eventually, a Minnesota State Trooper, who had received a digital alert

from dispatch about the BMW's involvement in the trafficking activity, along

with the car's description and license plate number, was notified that

investigators had located the vehicle.  Id. at *2.  The investigators ordered the

trooper to stop the BMW.  Id.  The trooper found the BMW on the interstate,

then followed it for several minutes.  Id.  The trooper developed her own basis

for initiating a traffic stop when she observed the BMW's windows were illegally

tinted.  Id.  The trooper pulled the car over, and asked the driver, Rowe, a

series of routine traffic stop questions and started routine paperwork tasks

incident to the stop.  Id.  Investigators advised officers on the scene that the

BMW would be impounded based on the probable cause supplied by the

informant.  Id.

      After approximately 25 minutes, Rowe was removed from the vehicle and

placed, handcuffed, in the back of a squad car.  Id. at *3.  While the trooper

continued her paperwork, other officers arrived, one with a police service dog,

and began searching the BMW.  Id.  They found no drugs in the roadside

29

search, but the dog indicated the presence of drugs inside a speaker in the BMW's trunk.  Id.  The BMW was towed to an impound lot and Rowe was taken to a police station, where he was questioned by investigators then released.  Id. Police secured a warrant to search the impounded BMW, and they found six kilograms of cocaine inside a speaker in the trunk.  Id.  Later, a grand jury indicted Rowe for conspiracy to distribute controlled substances.  Id. at *4.

Rowe moved to suppress the cocaine and other evidence police located as a result of the traffic stop, as well as statements he made during the stop.  Id. at *5.  One of the grounds for suppression Rowe asserted was that the stop exceeded constitutional bounds because it was prolonged beyond the time it would reasonably take to investigate the window tint traffic violation.  Id. at *5. The magistrate judge who heard the motion to suppress recommended that the stop of Rowe did not fall under the analytical framework of Terry and Rodriguez because "[t]he constitutional limits imposed on Terry stops . . . are inapplicable if officers have probable cause to believe that the vehicle contains contraband or that its occupants are involved in criminal activity."  Id. at *6 (citing United States v. Pratt, 355 F.3d 1119, 1124 (8th Cir. 2004) ("[B]ecause the officers had probable cause to arrest Pratt, Terry is inapplicable.")).  See also Berkemer v. McCarty, 468 U.S. 420, 439 n.29 (1984) (explaining that while "most traffic stops resemble, in duration and atmosphere, the kind of brief detention authorized in Terry," that does not mean "that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a Terry stop").

30

Instead, the court found that the stop of Rowe was "not a typical or routine traffic stop justified by the mere observation of a traffic violation;" "the stop, search, and seizure of the BMW were objectively justified by the existence of probable cause to believe that the vehicle contained cocaine." Rowe, 2016 WL 11394998, at *6.  The district court adopted the magistrate judge's recommendation on this issue, and the Eighth Circuit, reviewing *de novo*, affirmed.

The government also directs the court to United States v. Mosley, 878 F.3d 246 (8th Cir. 2017), and United States v. Harry, 930 F.3d 1000 (8th Cir. 2019).  In both Mosley and Harry police had specific, articulable facts that supported reasonable suspicion to search the vehicle in question based on criminal activity independent from any traffic violations police observed.  In Harry, police had reasonable suspicion to stop and search the truck because an informant had tipped them off to a drug pick up by the defendant and provided information about the truck the defendant would be driving, including registration information, who would be in the truck, and what time the truck would return from the pick up.  Harry, 930 F.3d at 1006.  This information provided reasonable suspicion of criminal activity independent of the traffic violation law enforcement observed the defendant make.  Id.

Similarly, in Mosley, the Eighth Circuit found the traffic stop's mission was more extensive than addressing the observed traffic violation because law enforcement had reasonable suspicion to stop and search the vehicle based on a tip from a witness to a bank robbery.  878 F.3d at 254.  The witness saw the

31

robbers run away from the bank, lost sight of them, then saw a gray/silver Ford Taurus drive away.  The Taurus was the only vehicle that left the vicinity of the bank in the moments after the robbery.  Id. at 250.  Based upon the witness' information, which included the vehicle's direction of travel, police stopped a car that matched the given description that was traveling in the stated direction.  Id.  Police ultimately searched the trunk of the vehicle and discovered the robbers, who were hiding therein.  Id.

The Eighth Circuit rejected the defendants' Rodriguez argument on the basis that the mission of the stop was not to address a traffic violation or even to identify whether the driver matched the known description of the robbers. Id. at 254.  Instead, the mission of the stop was to determine whether the vehicle was involved in the robbery, and law enforcement accomplished this mission without prolonging the stop.  Id.

Rowe, Mosley, and Harry are distinguishable from this case because the investigators lacked reasonable suspicion or probable cause to believe the Pontiac contained contraband or that it or its occupants were involved in criminal activity.  Here, the government argues police had probable cause beyond that required for an ordinary traffic stop based upon the investigators' knowledge of the trafficking operation, numerous unspecified drug seizures in 2019, the monitored calls that linked ████████████████ the trafficking operation, including surveillance related to the November 3 delivery from

32

Omaha, surveillance of Mr. Phiengsai's apartment[7] on November 7, 2019, and

the methamphetamine found during the traffic stop of Ms. Devaney and

Ms. Sidel earlier in the afternoon on November 7.  <u>See</u> Docket No. 30 at p. 9.

But these things, taken together, do not amount to reasonable suspicion or

probable cause to believe the Pontiac contained contraband or that it or its

occupants were involved in criminal activity.

   The investigators who were monitoring 3610 E. 6th Street saw Austin

Johnson doing what appeared to be countersurveillance after they resumed

surveillance following the traffic stop of Ms. Devaney.  Austin Johnson, driving

his Chevrolet pickup, drove slowly and looked into Special Agent Glenn's

vehicle in what appeared to Special Agent Glenn to be an attempt to determine

whether the investigators were conducting surveillance of the apartment

building.  Although Austin Johnson was not a target of the ongoing narcotics

investigation, Special Agent Glenn testified he was known to the investigators

from previous narcotics investigations, and they formed the belief that Austin

Johnson might be the unidentified roommate.  Then, the investigators observed

Austin Johnson return to the apartment building.

   Based upon his past involvement in narcotics operations, his presence at

Mr. Phiengsai's apartment building close in time to the known narcotics

---

[7] In its written submission to the court, the government characterizes this
surveillance as of Mr. Johnson's apartment.  This is misleading.  At the time of
the surveillance, investigators had no idea who Mr. Johnson was.  While
investigators were aware that Mr. Phiengsai had a roommate who might have
been involved in the operation based upon their interaction with Ms. Devaney
on the call monitored by Special Agent Byron, the government makes no
attempt to argue probable cause on that basis.

trafficking activity between Mr. Phiengsai and Ms. Devaney, and his
countersurveillance behavior, the investigators had some basis to believe
Austin Johnson was involved in the narcotics operation.  Then, when the
Pontiac departed the apartment parking lot approximately two hours later,
investigators knew it was registered to Austin Johnson, but they could not
confirm the driver's identity due to the tinted windows.  While it is true
investigators had reason to believe there was a significant amount of
methamphetamine from a recent shipment from Omaha still in the hands of
the trafficking operation, and possibly in the care of Mr. Phiengsai, Special
Agent Glenn testified that investigators had no reason to believe the Pontiac
was involved in the larger trafficking operation.  Thus, the only information
investigators had connecting the Pontiac to any narcotics activity was that it
was registered to Austin Johnson.

        This information falls far short of the facts police knew in <u>Rowe</u>, <u>Mosley</u>,
and <u>Harry</u> that supported reasonable suspicion or probable cause to believe the
vehicles in those cases contained contraband or evidence of a crime.  In <u>Rowe</u>,
the confidential informant told investigators, and investigators corroborated,
that the cocaine would be driven in a gray BMW owned by a particular person
from Arizona to Minnesota on a certain date.  Thereafter police obtained the
license plate number for a gray BMW owned by that particular person.  Then,
on the appointed day, they located that vehicle driving on the interstate in
Minnesota.  These facts clearly support probable cause to believe the BMW
contained contraband.

Similarly, in <u>Mosley</u> and <u>Harry</u>, police received information from a witness and informant, respectively, providing information to support reasonable suspicion of criminal conduct related to the vehicles stopped by police.  Police received no such information here and, as Special Agent Glenn testified, they had no reason to believe the Pontiac was connected to the trafficking operation.

The facts in the case do not support a finding of probable cause to believe there was contraband in the Pontiac.  Investigators had no specific reason to believe there was methamphetamine in the Pontiac; no one tipped them off to this fact, and this information was not obtained through the monitored phone calls.  Instead, all the investigators had to tie the Pontiac to the trafficking operation was its owner, Austin Johnson, who drove a different vehicle earlier in the day in a manner consistent with countersurveillance in the vicinity of the apartment, then entered the building where Mr. Phiengsai's apartment was.  Investigators never received confirmation that Austin Johnson contacted Mr. Phiengsai, and, although he was known to them from other narcotics investigations, they had no reason to believe he was involved in this operation until they observed his suspicious behavior on November 7.  These facts do not amount to probable cause to believe there was contraband in the Pontiac.

Nor did police have reasonable suspicion or probable cause to believe the Pontiac or its occupants were involved in criminal activity.  Here, for the reasons stated above, police may have had reasonable suspicion to believe

35

Austin Johnson was involved in criminal activity.  When the Pontiac departed the apartment building's parking lot, the police could not see who was driving due to the tinted windows.

However, it was Alex Johnson, not Austin Johnson, behind the wheel of the Pontiac.  The government conceded investigators had no reason to believe Alex Johnson was involved in the trafficking operation and had never heard Alex Johnson's name in the phone calls they monitored.  Therefore, as soon as Officer Stevens identified the driver was Alex Johnson, any reasonable suspicion based upon Austin Johnson's suspected involvement in the trafficking operation evaporated.  This conclusion is required because, even accepting Officer Stevens' possible ignorance of any distinction between the brothers, the narcotics investigators had no knowledge that would lead to suspicion of Alex Johnson's involvement in the narcotics operation before the traffic stop; therefore, there was no knowledge to impute to Officer Stevens to support probable cause or reasonable suspicion.

Because investigators had no reasonable suspicion or probable cause to believe there was contraband in the Pontiac or that it or its occupants were involved in criminal activity, Rowe, Mosley, and Harry are inapplicable and the bounds set by the Fourth Amendment on the scope of a Terry stop apply.  Therefore, Officer Stevens' traffic stop of Mr. Johnson was "[a] seizure justified only by a police-observed traffic violation."  United States v. Rodriguez, 575 U.S. 348, 350 (2015).  Accordingly, the court analyzes the stop of Mr. Johnson under the framework of Terry and Rodriguez.

36

### 2.    Whether Officer Stevens Unreasonably Prolonged the Traffic Stop in Violation of the Fourth Amendment

"For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest.  Berkemer v. McCarty, 468 U.S. 420, 439 . . . (1984).  As such, a traffic stop is governed by the principles of Terry v. Ohio, 392 U.S. 1 . . . (1968)."  United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001).

The constitutional analysis under Terry is two-part: (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  Terry, 392 U.S. at 20.  Thus, a traffic stop that is "lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes . . . interests protected by the Fourth Amendment[.]"  United States v. Jacobsen, 466 U.S. 109, 124 (1984).  As noted above, Mr. Johnson does not dispute that the initial traffic stop was justified.  Therefore, the question before the court is whether the stop was unjustifiably prolonged beyond the limitations of the Fourth Amendment.

"Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, [Illinois v. Caballes, 543 U.S. 405, 407 (2005)], and attend to related safety concerns[.]"  Rodriguez, 575 U.S. at 354.  See also Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification.").  "[A]n investigative detention must be temporary and last no

37

longer than is necessary to effectuate the purpose of the stop.  Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Royer, 460 U.S. at 500.  "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Caballes, 543 U.S. at 407.  "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 575 U.S. at 354.

"Beyond determining whether to issue a traffic ticket, an officer's mission [during a traffic stop typically] includes . . . checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez, 575 U.S. at 355.  See also United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) (finding other inquiries incident to a traffic stop may include "inquiring about the occupants' destination, route, and purpose" (quotation omitted)).  "When complications arise 'in carrying out the traffic-related purposes of the stop, . . . police may reasonably detain a driver for a longer duration than when a stop is strictly routine.' " United States v. Soderman, 983 F.3d 369, 374 (8th Cir. 2020) (quoting United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007)).

Absent further reasonable suspicion, an officer may not conduct unrelated checks that extend the stop beyond the time reasonably required to

complete its original mission.  Rodriguez, 575 U.S. at 354-55.  Yet, an officer may lawfully engage in unrelated inquires so long as they do not measurably extend the duration of the stop.  Id. at 355.  The Supreme Court in Rodriguez found that a dog sniff is not an ordinary inquiry incident to a traffic stop and, "by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing."  Id. (quoting Indianapolis v. Edmond, 531 U.S. 32, 40-41 (2000)).  "[A] dog sniff is not fairly characterized as part of the officer's traffic mission."  Rodriguez, 575 U.S. at 356.

The government argues the traffic stop was not unlawfully prolonged because the unrelated inquiries the officers engaged in did not measurably extend the duration of the stop beyond the time required for the window tint warning and the citation for driving without a license.  In support thereof, the government recites an incomplete timeline of events: "At 14:45 minutes into the stop, the tint measure was determined.  At 21:35 minutes, Officer Westrum and the K-9 arrived on scene.  At 28:55 minutes, the ticketing/warning process was completed by Officer Stevens."  Docket. No. 26 at p. 11.  The government renewed this argument at the suppression hearing.  See Docket No. 30 at p. 130.

The government's argument relies on a fatally narrow interpretation of the rule announced in Rodriguez:  that unrelated inquiries are permissible so long as they occur before the officer actually issues the citation or ticket.  Instead, the rule is that "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—*or reasonably should have been*—completed."

39

Rodriguez, 575 U.S. at 354 (emphasis added).  Accordingly, Rodriguez would require that all unrelated inquiries, including the dog sniff, occur before the time reasonably required for Officer Stevens to complete the driver's license citation and window tint warning.

"If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.' " Rodriguez, 575 U.S. at 357 (quoting Caballes, 543 U.S. at 407).  As the Supreme Court held in Caballes and reaffirmed in Rodriguez, "a traffic stop 'prolonged beyond' that point is 'unlawful.' " Rodriguez, 575 U.S. at 357 (quoting Caballes, 543 U.S. at 407).  "The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, . . ., but whether conducting the sniff prolongs—i.e., adds time to—the stop." Rodriguez, 575 U.S. at 357 (quotation and citation omitted).  Accordingly, the question properly before the court is whether police could have completed the traffic-related inquiries expeditiously and, if so, whether the traffic stop exceeded the amount of time reasonably required to complete them.

The citation and warning, however, were not the only activities incident to the mission of the traffic stop.  Officer Stevens' discovery that Mr. Johnson was effectively driving without a license justifiably extended the lawful scope of the traffic stop because of Mr. Johnson's legal inability to remove the Pontiac from the scene and the consequential need for a licensed driver or tow truck to do so.  See Soderman, 983 F.3d at 374 (citing United States v. Ovando-Garzo, 752 F.3d 1161, 1164 (8th Cir. 2014)).

40

The Eighth Circuit's recent holding in United States v. Soderman, 983 F.3d 369 (8th Cir. 2020), requires this finding.  In Soderman, a motorist was pulled over for speeding on an interstate in Iowa while traveling from Colorado to Minnesota to visit his father and stepmother.  Id. at 372.  While completing a records check incident to the stop, the Iowa State Trooper who stopped Soderman discovered that his driver's license had been suspended.  Id. at 372-73.  The trooper also believed he had observed indicia of drug trafficking and requested the support of a drug interdiction officer.  Id. at 373.  Soderman called a tow truck to pick up his vehicle because he could not lawfully drive it with a suspended license.  Id.

The drug interdiction officer arrived before the tow truck.  She concluded, based upon her observations of Soderman, what was visible in the vehicle's passenger compartment, and information she received in a phone conversation with Soderman's father[8] that she had probable cause to believe there was drug paraphernalia in the car.  Id.  The officer seized the vehicle and called a second tow truck.  Id.  The trooper issued Soderman tickets for speeding and driving with a suspended license.  Id.  The tow truck Soderman

---

[8] Because Soderman was confused about their exact location on the interstate, he handed the officer his phone so she could give Soderman's father directions. During her conversation with Soderman's father, the officer asked several questions about Soderman's history of drug trafficking and his plans to visit them in Minnesota.  Soderman's father told the officer Soderman had been involved in trafficking in the past and that he did not know Soderman was presently on his way to Minnesota for a visit.  Soderman, 983 F.3d at 373.

requested arrived, and the drug interdiction officer told the tow truck driver she would be using the services of a different company.  The tow truck left.  Id.

Shortly thereafter, and 75 minutes after the traffic stop began, Soderman walked away from the scene, leaving his vehicle with the trooper and the drug interdiction officer.  Id.  The second tow truck arrived, and it delivered Soderman's vehicle to the impound lot.  Id.  The drug interdiction officer obtained a warrant[9] to search the vehicle.  Id.  During the search, the officer discovered drugs and contraband.  Id.  Thereafter, Soderman moved to suppress the evidence obtained from his vehicle and statements he made during the traffic stop.  Id.  The district court denied the motion to suppress, and Soderman appealed that denial.  Id.

On review, the Eighth Circuit first considered Soderman's argument that the initially valid traffic stop was unlawfully extended in violation of Rodriguez. Id. at 374.  Soderman argued the trooper extended the traffic stop beyond the time reasonably required to complete its mission, thereby giving the drug interdiction officer time to arrive, develop probable cause, and seize the vehicle. Id.  The Eighth Circuit held that the trooper did not unreasonably prolong the detention of Soderman because the discovery that Soderman was driving on a suspended license created a complication that justifiably extended the lawful scope of the traffic stop.  Id.  The Eighth Circuit rejected Soderman's argument

_____

[9] The officer mistakenly submitted only an application and affidavit for a search warrant without submitting the warrant itself.  Soderman, 983 F.3d at 373. The validity of that warrant, however, does not bear on the applicability of Soderman to this case.

42

on this basis, finding the trooper did not unlawfully prolong the traffic stop because the scope of the stop expanded once it was ascertained a licensed driver or tow truck would need to remove the vehicle from the roadway. Id.

Likewise here, the scope of Officer Stevens' initial traffic stop of Mr. Johnson was expanded once he ascertained that Mr. Johnson would not be able to remove the vehicle from the scene and that a licensed driver or a tow truck would need to remove the vehicle. Thus, the time reasonably required to complete the traffic stop includes not only the time required to issue the window tint warning and the driver's license citation, but also the time reasonably required for someone else to arrive on scene to remove the Pontiac. See Soderman, 983 F.3d at 374 ("When complications arise in carrying out the traffic-related purposes of the stop, . . . police may reasonably detain a driver for a longer duration than when a stop is strictly routine." (quotation omitted)). If Officer Westrum and Robi's dog sniff occurred within the time reasonably required for someone else to arrive to pick up the Pontiac, the detention was not unlawfully prolonged. See Rodriguez, 575 U.S. at 355 (an officer may lawfully engage in inquiries unrelated to the stop's mission so long as they do not measurably extend the duration of the stop); Soderman, 983 F.3d at 374.

Here, Officer Westrum's development of probable cause based upon Robi's positive indication occurred within the time reasonably required for someone to arrive and lawfully drive the Pontiac away. Although he did not come to pick up the vehicle, Mr. Johnson's grandfather came to the scene to pick up Mr. Johnson's dog. Under Soderman, the arrival of Mr. Johnson's

43

grandfather marks the extent of time reasonably required for someone to come pick up the Pontiac.  Because Officer Westrum developed probable cause to believe there were drugs in the Pontiac's trunk *before* Mr. Johnson's grandfather arrived, the dog sniff, an activity unrelated to the mission of the traffic stop, did not extend the duration of the stop.  Therefore, the stop was not prolonged and did not violate Rodriguez.

Mr. Johnson cites United States v. Barrera, No. 20-CR-10010, 2020 WL 6268395 (D.S.D. Oct. 9, 2020), and United States v. Peralez, 526 F.3d 1115, 1120 (8th Cir. 2008), in support of his position that Officer Stevens unconstitutionally prolonged the traffic stop beyond the time reasonably required to complete its purpose.  But, just as the Eighth Circuit in Soderman distinguished those facts from Peralez, so too are Peralez and Barrera distinguishable here.  In Peralez and Barrera, police prolonged the detentions of the defendants to ask unrelated drug interdiction questions or wait for another officer to arrive on scene.  Here, unlike in Peralez and Barrera, where there were no issues with the drivers' legal ability to drive away, the detention was not prolonged because the scope of the stop of Mr. Johnson expanded once Officer Stevens determined Mr. Johnson could not lawfully drive the Pontiac away.

The court concludes no Fourth Amendment violation occurred because the traffic stop of Mr. Johnson was not unlawfully prolonged beyond the time reasonably required to attend to the inquiries incident to the traffic stop— including ensuring the Pontiac could be lawfully removed from the scene.

44

Officer Westrum's development of probable cause occurred within this time, and therefore the warrantless search of the Pontiac's trunk was supported by valid probable cause.[10]  Accordingly, the evidence obtained from the Pontiac should not be suppressed.

**B.    Whether Mr. Johnson's Statements to Detective Christensen After Being Arrested Violated <u>Miranda</u> and Should Be Suppressed**

Mr. Johnson asserts statements he made to Detective Christensen after being arrested violated <u>Miranda</u> and should be suppressed.  "[A]n individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning."  <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)).  Accordingly, a <u>Miranda</u> warning is required prior to law enforcement questioning an individual whenever the individual is in custody and is being interrogated.  <u>United States v. Flores-Sandoval</u>, 474 F.3d 1142, 1146 (8th Cir. 2007).

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government.  <u>See</u> <u>United States v. Charbonneau</u>, 979 F. Supp. 1177, 1181 (S.D. Ohio 1997).  Other courts have placed the initial burden on the defendant to prove that he was "in custody," with the burden of proof shifting to the government to prove a

---

[10] The warrantless search of the car, supported by probable cause as a result of the drug dog's alert, falls under the automobile exception to the warrant requirement under the Fourth Amendment.  <u>See</u> <u>Pennsylvania v. Labron</u>, 518 U.S. 938, 940 (1996) (per curiam); <u>United States v. Caves</u>, 890 F.2d 87, 89 (8th Cir. 1989).

voluntary waiver only after the defendant has sustained his initial burden.  See United States v. Moore, 104 F.3d 377, 392 (D.C. Cir. 1997) (Silberman, J., concurring) ("[I]t is the appellant's burden to establish factually that he was in custody as a pre-condition to an argument that the Constitution protects his silence[.]").  The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have.  See, e.g., United States v. Morriss, No. 06-6010-01-CR-SJ-SOW, 2006 WL 3519344, at *12 (W.D. Mo. Dec. 6, 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority).  For purposes of this report and recommendation, the court has placed the burden of proving that Mr. Johnson's statements were *not* the subject of custodial interrogation on the government.  See United States v. McCarty, No. CR. 08-50035, 2008 WL 11404530, at *5 (D.S.D. Aug. 25, 2008) (placing burden on government to show defendant's statements were not the subject of custodial interrogation), report and recommendation adopted as modified, 2008 WL 11404531 (D.S.D. Oct. 7, 2008), aff'd, 612 F.3d 1020 (8th Cir. 2010).

A suspect is considered to be "in custody" either upon his or her formal arrest or "under any other circumstances where the suspect is deprived of his" or her "freedom of action in *any* significant way."  Griffin, 922 F.2d at 1347 (citing Berkemer, 468 U.S. at 429).

The government does not dispute Mr. Johnson's assertion that he was in custody when he was arrested, put in handcuffs, and placed in the back of Officer Stevens' patrol vehicle.  Accordingly, the court focuses only on whether

the questions Detective Christensen asked Mr. Johnson amounted to interrogation.  If the questions amounted to an interrogation, Mr. Johnson's responses should be suppressed because he had not been Mirandized before Detective Christensen asked them.

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect.  See Rhode Island v. Innis, 446 U.S. 291, 301 (1980); see also United States v. Head, 407 F.3d 925, 927 (8th Cir. 2005) ("Interrogation includes not only express questioning by law enforcement officers, but also words or actions that officers should know are reasonably likely to elicit an incriminating response from a suspect.").  The "words or actions" of the police must be outside the scope of words and actions that normally accompany the arrest and taking into custody of a defendant. United States v. Wipf, 397 F.3d 677, 685 (8th Cir. 2005) (citing Innis, 446 U.S. at 301).

The government asserts Mr. Johnson's statements to Detective Christensen are not subject to suppression for violating Miranda because they either contained biographical information, were a statement identifying a dangerous item, or because the government would stipulate to use them for impeachment purposes only.

"[I]t is well-settled that routine biographical data is exempted from Miranda's coverage,"  "even if the information turns out to be incriminating." United States v. Brown, 101 F.3d 1272, 1274 (8th Cir. 1996) (quotation omitted).  This category may include questions about a person's employment,

family ties, length of residence in the community, and records concerning appearances at court proceedings.  United States v. McLaughlin, 777 F.2d 388, 391-92 (8th Cir. 1985).

Here, there were several questions Detective Christensen asked Mr. Johnson that were biographical in nature.  Detective Christensen asked Mr. Johnson, for example, about his criminal history, his age, and his brother's age.  These questions for biographical information, even biographical information about Mr. Johnson's brother, were not interrogation under Miranda.  This is because interrogation for Miranda purposes refers to questioning or conduct that the government officer should know is reasonably likely to elicit an incriminating response from the suspect.  Innis, 446 U.S. at 301.  The questions seeking biographical information about Mr. Johnson's age, his brother's age, and his criminal history were not reasonably likely to elicit an incriminating response, and they were therefore not interrogation under Miranda.

Next, the government asserts the questions related to the smoking instrument are excepted from Miranda because Detective Christensen asked them in the interest of public safety.  When the "need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination," un-Mirandized statements may be admitted.  New York v. Quarles, 467 U.S. 649, 657 (1984); see also United States v. Thompson, 976 F.3d 815, 824 (8th Cir. 2020).  In this context, protection of the public safety

48

includes protection of the police officers themselves.  Quarles, 467 U.S. at 658 n.7, 659.  This "exception applies when 'police officers ask questions reasonably prompted by a concern for the public safety.' . . .  It does not apply to 'questions designed solely to elicit testimonial evidence from a suspect."  United States v. Liddell, 517 F.3d 1007, 1009 (8th Cir. 2008) (quoting Quarles, 467 U.S. at 656, 659).  The Eighth Circuit has recognized that the risk of police officers being injured by the mishandling of unknown drug paraphernalia can provide a sufficient public safety basis to ask a suspect who has been arrested and secured about the presence of contraband in a car that officers are going to search.  Liddell, 517 F.3d 1009-10.

In United States v. Noonan, 745 F.3d 934 (8th Cir. 2014), the Eighth Circuit affirmed the applicability of the public-safety exception to Miranda in the context of concern over the dangers posed by the manufacture of methamphetamine.  Id. at 937-38.  In Noonan, a police officer pulled the defendant over on suspicion of driving while intoxicated and learned, when checking Noonan's license, that Noonan had an active arrest warrant for the manufacture of methamphetamine.  Id. at 935.  The officer placed Noonan under arrest and put him in the back of the patrol car.  Id. at 936.  The officer stated his intention to search and move Noonan's vehicle, which was parked close to a nearby trailer park driveway, at which point Noonan told the officer that someone else had left something in his car.  Id.  The officer asked Noonan if there was meth in the car, what was in the car, if whatever was in the car

49

would hurt him, and if the item in the car was a one-pot cooking apparatus. Id. at 936-37.

Noonan moved the district court to suppress his responses to these questions as violative of Miranda.  The district court denied suppression on the basis that these questions fit into the public-safety exception to Miranda.  Id. at 937.  The Eighth Circuit, on review, agreed.  The Eighth Circuit looked to the officer's testimony at the suppression hearing, where the officer testified that he knew Noonan to be a methamphetamine cook and believed there was a reasonable probability that there might be a methamphetamine cooking apparatus in the car.  Id. at 938.  Due to the volatility of a methamphetamine lab, the officer stated that he did not want to be exposed to any kind of chemical that would hurt him.  Id.  The Eighth Circuit found that the officer's question about whether there was a one pot in the car "evidenced a justifiable concern about the dangers surrounding the manufacture of methamphetamine, an 'inherently dangerous activity that creates substantial risks to public health and safety.' "  Id. (quoting United States v. Ellefson, 419 F.3d 859, 866 n.4 (8th Cir. 2005).

Here, Officer Westrum testified that he believed the item to be a one-pot methamphetamine cooking apparatus.  Although Detective Christensen told the other officers he thought the device was just a homemade smoking utensil before he asked Mr. Johnson what the smoking utensil was, Detective Christensen testified that he had not seen anything like it before and "sometimes you can only guess what things are."  See Docket No. 30 at

50

p. 122-23.  Detective Christensen also testified that he asked Mr. Johnson
what the item was because he wanted to make sure there was not anything
hazardous in the car which could harm the officers who were searching the
trunk at that time:  "I hadn't seen anything quite like it before.  To make sure
that there wasn't some kind of attempt to cook meth.  And as they got digging
in, there's hazardous items that they could have come across.  So I wanted just
to ask him for their safety."  See Docket No. 30 at p. 117.  The reasonableness
of the officers' belief that there were dangerous items related to the
manufacture of methamphetamine in the trunk was further supported by the
presence of butane.

    While the record clearly shows Detective Christensen suspected the item
to be merely a smoking utensil before he spoke with Mr. Johnson, he testified
that he had never seen anything quite like this item before and therefore
wanted to make certain it was not a cooking apparatus in the interest of the
safety of the officers searching the trunk.  Considering the hazards posed by
the manufacture of methamphetamine as recognized in Noonan, Detective
Christensen's impression about the item's safety does not disqualify his
question from the public-safety exception to Miranda.

    Moreover, the standard for the public safety exception under Quarles and
Liddell is not so exacting as to require police to have no pre-formed belief about
an item's safety.  Instead, questions from police need only be "reasonably
prompted by a concern for the public safety" to fall under this exception.
Liddell, 517 F.3d at 1009 (quoting Quarles, 467 U.S. at 656).  Based upon his

hearing testimony, the hazards presented by the manufacture of methamphetamine, and the presence of a fuel cannister in the trunk, Detective Christensen's question asking Mr. Johnson what the item was was reasonably prompted by a concern for officer safety, and it therefore falls under the public safety exception to <u>Miranda</u>.

Lastly, Mr. Johnson seeks the suppression of the other statements he made in response to Detective Christensen's pre-<u>Miranda</u> questioning.  The government asserts these statements need not be suppressed based upon the government's representation that it would not use these statements except for impeachment.  The court declines the government's invitation to leave resolving this <u>Miranda</u> issue to the parties.  Under <u>Miranda</u>, statements Mr. Johnson made in response to custodial interrogation before he was Mirandized may not be used as evidence against him.  The court finds that the statements Mr. Johnson made after Detective Christensen asked him where the methamphetamine came from were in response to interrogation because Detective Christensen's questions were reasonably calculated to elicit incriminating responses.  Therefore, as to Mr. Johnson's statements in response to Detective Christensen's questions about the source of the methamphetamine, the court recommends granting Mr. Johnson's motion to suppress.

**C.   Whether Evidence Obtained from the Search of Mr. Johnson's Apartment Should Be Suppressed as Fruit of the Poisonous Tree**

The Fourth Amendment permits the government and its agents to enter a person's house against their will and seize their property as evidence against

them, but only with a "[w]arrant based upon probable cause, supported by Oath or affirmation . . . ."  U.S. Const. amend. IV.  However, the Fourth Amendment prohibits the government from gaining any advantage through illegally obtained evidence.

"The exclusionary rule 'reaches not only primary evidence obtained as a result of an illegal search or seizure . . . but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." United States v. Swope, 542 F.3d 609, 613 (8th Cir. 2008) (quoting Segura v. United States, 468 U.S. 796, 804 (1984)).

Here, the search of the trunk of the Pontiac did not violate Mr. Johnson's Fourth Amendment rights.  Therefore, the resulting evidence was obtained legally, and it legally supported the application for a search warrant for Mr. Johnson's apartment.  The affidavit in support of the search warrant provided probable cause for the apartment search.  Mr. Johnson makes no argument that the affidavit in support of the search warrant otherwise lacked probable cause—he only argues that it lacked probable cause once evidence obtained at the traffic stop is subtracted.  Consequently, the court recommends denying Mr. Johnson's motion to suppress the evidence obtained in the search of his apartment on the basis that the warrant was obtained based upon probable cause developed after an illegal search of the Pontiac.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends that defendant Alex Olin Johnson's motion to

53

suppress [Docket No. 20] be DENIED IN PART AND GRANTED IN PART as follows:

1.      defendant's motion to suppress as to the evidence obtained from the search of the Pontiac be DENIED;

2.      defendant's motion to suppress the statements made to Detective Christensen be GRANTED as to statements made in response to direct questions about the methamphetamine;

3.      defendant's motion to suppress the statements made in response to questions seeking biographical information and about the smoking utensil be DENIED; and

4.      that defendant's motion to suppress the evidence obtained in the warrant search of his apartment as fruit of the poisonous tree be DENIED.

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED March 16, 2021.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge